UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

JEAN-PAUL DONALD LEMIRE          :
                                :
            v.                  :          C.A. No. 15-331L
                                :
CAROLYN COLVIN, Acting          :
Commissioner of the Social Security   :
Administration                  :

## REPORT AND RECOMMENDATION

Lincoln D. Almond, United States Magistrate Judge

This matter is before the Court for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"), 42 U.S.C. § 405(g). Plaintiff filed his Complaint on August 7, 2015 seeking to reverse the decision of the Commissioner. On January 29, 2016, Plaintiff filed a Motion to Reverse the Defendant's Final Decision. (Document No. 14). On March 29, 2016, the Commissioner filed a Motion for an Order Affirming the Decision of the Commissioner. (Document No. 17). Plaintiff filed a Reply Brief on April 13, 2016. (Document No. 18).

This matter has been referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B); LR Cv 72. Based upon my review of the record, the parties' submissions and independent research, I find that there is substantial evidence in this record to support the Commissioner's decision and findings that Plaintiff is not disabled within the meaning

of the Act.  Consequently, I recommend that Plaintiff's Motion (Document No. 14) be DENIED and that the Commissioner's Motion (Document No. 17) be GRANTED.

## I.      PROCEDURAL HISTORY

Plaintiff filed applications for DIB (Tr. 248-251) and SSI (Tr. 252-258) on November 23, 2009 alleging disability since November 9, 2009.  (Tr. 252).  The Applications were denied initially on August 17, 2010 (Tr. 101-103, 104-106) and on reconsideration on March 11, 2011.  (Tr. 109-111, 112-114).  Plaintiff requested an Administrative Hearing.  On June 19, 2012, a hearing was held before Administrative Law Judge Martha Bower (the "ALJ") at which time Plaintiff, represented by counsel, and a vocational expert ("VE") and medical expert ("ME") appeared and testified.  (Tr. 33-54).  The ALJ issued an unfavorable decision to Plaintiff on July 13, 2012.  (Tr. 78-96).  On September 25, 2013, the Appeals Council remanded the case back to the ALJ.  (Tr. 97-100).  A second hearing was held before the ALJ on March 17, 2014.  (Tr. 55-73).  The ALJ issued an unfavorable decision to Plaintiff on April 23, 2014.  (Tr. 11-32).  The Appeals Council denied Plaintiff's request for review on July 14, 2015.  (Tr. 1-6).  Therefore the ALJ's decision became final.  A timely appeal was then filed with this Court.

## II.     THE PARTIES' POSITIONS

Plaintiff argues that the ALJ abused her discretion by refusing to accept late-tendered medical evidence.  He also contends that the ALJ's RFC assessment is not supported by the record and that the ALJ did not properly account for the impact of Plaintiff's morbid obesity on his other impairments.

The Commissioner disputes Plaintiff's claims and contends that the ALJ did not abuse her discretion in refusing to admit the late-tendered documents pursuant to the so-called "five day rule"

and that the record supports her RFC assessment.  The Commissioner also asserts that the ALJ adequately accounted for Plaintiff's obesity and mental impairments.

### III.     THE STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Ortiz v. Sec'y of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

Where the Commissioner's decision is supported by substantial evidence, the court must affirm, even if the court would have reached a contrary result as finder of fact.  Rodriguez Pagan v. Sec'y of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).  The court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  Frustaglia v. Sec'y of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

The court must reverse the ALJ's decision on plenary review, however, if the ALJ applies incorrect law, or if the ALJ fails to provide the court with sufficient reasoning to determine that he or she properly applied the law.  Nguyen v. Chater, 172 F.3d  31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).  Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence

establishes without any doubt that the claimant was disabled.  Seavey v. Barnhart, 276 F.3d 1, 11 (1st

Cir. 2001) citing, Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985).

The court may remand a case to the Commissioner for a rehearing under sentence four of 42

U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences.  Seavey, 276

F.3d at 8.  To remand under sentence four, the court must either find that the Commissioner's

decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the

law relevant to the disability claim.  Id.; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980)

(remand appropriate where record was insufficient to affirm, but also was insufficient for district

court to find claimant disabled).

Where the court cannot discern the basis for the Commissioner's decision, a sentence-four

remand may be appropriate to allow her to explain the basis for her decision.  Freeman v. Barnhart,

274 F.3d 606, 609-610 (1st Cir. 2001).  On remand under sentence four, the ALJ should review the

case on a complete record, including any new material evidence.  Diorio v. Heckler, 721 F.2d 726,

729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals

Council).  After a sentence four remand, the court enters a final and appealable judgment

immediately, and thus loses jurisdiction.  Freeman, 274 F.3d at 610.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court...may at any time order additional evidence to be taken
> before the Commissioner of Social Security, but only upon a showing
> that there is new evidence which is material and that there is good
> cause for the failure to incorporate such evidence into the record in a
> prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish: (1) that there is new,

non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a

-4-

reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level.  See Jackson v. Chater, 99 F.3d 1086, 1090-1092 (11th Cir. 1996).

A sentence six remand may be warranted, even in the absence of an error by the Commissioner, if new, material evidence becomes available to the claimant.  Id.  With a sentence six remand, the parties must return to the court after remand to file modified findings of fact.  Id.  The court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.  Id.

## IV.    THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

### A.    Treating Physicians

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments, is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).  The ALJ may

-5-

discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  See Keating v. Sec'y of Health and Human Servs., 848 F.2d 271, 275-276 (1st Cir. 1988).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion.  20 C.F.R § 404.1527(c).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  See 20 C.F.R. § 404.1527(c)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (see 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the province of the Commissioner.  20 C.F.R. § 404.1527(e).  See also Dudley v. Sec'y of Health and Human Servs., 816 F.2d 792, 794 (1st Cir. 1987).

### B.      Developing the Record

The ALJ has a duty to fully and fairly develop the record.    Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right if counsel is not retained.  See 42 U.S.C. § 406; Evangelista v. Sec'y of Health and Human Servs., 826 F.2d 136, 142 (1st Cir. 1987).  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  Id.  However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  See Heggarty, 947 F.2d at 997, citing Currier v. Sec'y of Health Educ. and Welfare, 612 F.2d 594, 598 (1st Cir. 1980).

### C.      Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; see also Conley v. Bowen, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  Carrillo Marin v. Sec'y of Health and Human Servs., 758 F.2d 14, 17 (1st Cir. 1985).

### D.      The Five-step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not

disabled.   20 C.F.R. § 404.1520(b).   Second, if a claimant does not have any impairment or

combination of impairments which significantly limit her physical or mental ability to do basic work

activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).

Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart

P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do

not prevent her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth,

if a claimant's impairments (considering her residual functional capacity, age, education, and past

work) prevent her from doing other work that exists in the national economy, then she is disabled.

20 C.F.R. § 404.1520(f).  Significantly, the claimant bears the burden of proof at steps one through

four, but the Commissioner bears the burden at step five.  Wells v. Barnhart, 267 F. Supp. 2d 138,

144 (D. Mass. 2003) (five-step process applies to both SSDI and SSI claims).

     In determining whether a claimant's physical and mental impairments are sufficiently severe,

the ALJ must consider the combined effect of all of the claimant's impairments, and must consider

any medically severe combination of impairments throughout the disability determination process.

42 U.S.C. § 423(d)(2)(B).  Accordingly, the ALJ must make specific and well-articulated findings

as to the effect of a combination of impairments when determining whether an individual is disabled.

Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

     The claimant bears the ultimate burden of proving the existence of a disability as defined by

the Social Security Act.  Seavey, 276 F.3d at 5.  The claimant must prove disability on or before the

last day of her insured status for the purposes of disability benefits.  Deblois v. Sec'y of Health and

Human Servs., 686 F.2d 76 (1st Cir. 1982), 42 U.S.C. §§ 416(i)(3), 423(a), (c).  If a claimant

becomes disabled after she has lost insured status, her claim for disability benefits must be denied despite her disability.  Id.

### E.      Other Work

Once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  Seavey, 276 F.3d at 5.  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines (the "grids").  Seavey, 276 F.3d at 5.  Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  Id.; see also Heckler v. Campbell, 461 U.S. 458, 103 S. Ct. 1952, 76 L.Ed.2d 66 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills.  Nguyen, 172 F.3d at 36.  In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert.  Heggarty, 947 F.2d at 996.  It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  See Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-

exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.

### 1.    Pain

"Pain can constitute a significant non-exertional impairment." Nguyen, 172 F.3d at 36. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the First Circuit's six-part pain analysis and consider the following factors:

(1)    The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

(2)    Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

(3)    Type, dosage, effectiveness, and adverse side-effects of any pain medication;

(4)    Treatment, other than medication, for relief of pain;

(5)    Functional restrictions; and

(6)    The claimant's daily activities.

Avery v. Sec'y of Health and Human Servs., 797 F.2d 19, 29 (1st Cir. 1986). An individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A).

### 2.      Credibility

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. Rohrberg, 26 F. Supp. 2d at 309. A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. See Frustaglia, 829 F.2d at 195. The failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. See DaRosa v. Sec'y of Health and Human Servs., 803 F.2d 24 (1st Cir. 1986).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

### V.      APPLICATION AND ANALYSIS

Plaintiff was thirty-nine years old on the date of the ALJ's decision. Plaintiff has a ninth grade education (Tr. 59) and worked in the relevant past at Dunkin' Donuts, Burger King, Wal-Mart and CVS. (Tr. 23). Plaintiff last worked in November 2009. (Tr. 58). Plaintiff alleges disability due to cardiomyopathy, depression, major depressive disorder and generalized anxiety disorder. (Tr. 17, 489).

On November 11, 2009, Plaintiff visited the Emergency Room reporting chest pain and shortness of breath. (Tr. 366). He also reported a history of hypertension, for which he had not been taking his medications. (Tr. 366-367). An echocardiogram showed sinus rhythms, left anterior hemiblock, non-specific ST-wave changes and left atrial enlargement. (Tr. 368, 386). Plaintiff was diagnosed with congestive heart failure. (Tr. 368).

On November 24, 2009, Plaintiff followed up with Dr. Benilda Seballos at Thundermist Health Center. (Tr. 406-408). He reported that he had been feeling well since his discharge from the hospital, with no chest pain. (Tr. 406). He also reported that he smoked 21-30 cigarettes a day. Id. Dr. Seballos noted that Plaintiff's heart rate and rhythm were normal, his lungs were clear and he had no edema. Id. Her diagnoses included heart failure not otherwise specified (for which Plaintiff was now asymptomatic), hyperlipidemia, hypertension and bronchospasm. (Tr. 407). One month later, Plaintiff reported that he was taking his medications as directed, and denied chest pain or shortness of breath. (Tr. 409). Twice in March 2010, Plaintiff saw Erin Beaudry, a nurse-practitioner at Thundermist, for chest congestion and a cough. (Tr. 411, 413). A chest x-ray was normal. (Tr. 415). Ms. Beaudry noted wheezing and dyspnea, which improved slightly with nebulizer treatment. (Tr. 411, 413). She diagnosed asthmatic bronchitis, prescribed albuterol and encouraged Plaintiff to stop smoking. (Tr. 411).

On June 23, 2010, Plaintiff visited the Cardiology Clinic, reporting that he had been feeling relatively well recently, but still had fatigue and dyspnea after walking 100 feet. (Tr. 420). An echocardiogram showed normal sinus rhythm and no ischemic changes. (Tr. 421). Dr. Joshua Silverstein adjusted Plaintiff's medications, increased Plaintiff's hypertension medication dosage,

recommended Lovastatin for his high cholesterol, warned that Plaintiff was at risk of obstructive sleep apnea due to morbid obesity and recommended smoking cessation.  Id.

On July 7, 2010, Plaintiff followed up with Dr. Seballos, reporting no chest pain or shortness of breath, and Dr. Seballos noted that his lungs were normal, and his heart had a regular rate and rhythm, with no rubs, clicks, gallops or murmurs.  (Tr. 429).  A July 20, 2010 echocardiogram indicated that Plaintiff's left ventricle was moderately dilated with low normal systolic function and estimated his ejection fraction at 45-50%.  (Tr. 435).

On August 18, 2010, Plaintiff told Dr. Silverstein that he continued to experience dyspnea on exertion after walking 40-50 feet, and difficulty breathing with humidity and heat, but denied chest pain, orthopnea or lower extremity edema.  (Tr. 447).  He also reported that he smoked one pack of cigarettes a week.  Id.  A physical examination revealed some scattered wheezing, but otherwise clear lungs; regular heart rate and rhythm and no lower extremity edema.  (Tr. 448).  Dr. Silverstein stated that, based on the recent echocardiogram, Plaintiff had marked improvement in his left ventricular systolic function.  Id.  He also noted that Plaintiff's blood pressure was out of control that day, possibly due to recent Motrin usage and increased his ACE inhibitor dosage.  Id. On October 27, 2010, Dr. Silverstein noted that a recent echocardiogram indicated that Plaintiff's ejection fraction had increased to 50% and had not revealed any ischemia.  (Tr. 514).  Plaintiff continued to report shortness of breath after walking fifty feet, as well as periodic chest pain.  Id. A physical examination revealed normal heart rate and rhythm, scattered wheezes and no leg edema. (Tr. 515).  Dr. Silverstein told Plaintiff that he no longer needed to take Digoxin, given the recent improvements and that his recent chest pains were non-cardiac.  Id.  He advised Plaintiff to stop smoking.  Id.

On April 20, 2011, Plaintiff told Dr. Silverstein that he still got short of breath when walking up three flights of stairs but denied chest pain or palpitations. (Tr. 642). His heart rate and rhythm were normal, he had no leg edema, his peripheral pulses were 2+ and he had scattered expiratory wheezing. (Tr. 643). Dr. Silverstein suspected that Plaintiff's shortness of breath was due to a lung rather than a heart impairment and recommended testing. Id. A May 31, 2011 echocardiogram showed mildly decreased left ventricular systolic function and an estimated ejection fraction of 45-50%. (Tr. 641). A September 15, 2011 pulmonary function test revealed mild chronic obstructive pulmonary disease ("COPD"). (Tr. 520).

On January 26, 2012, Plaintiff was evaluated at the Cardiovascular Institute of New England. (Tr. 622-23). Dr. Sajid Siddiq noted extremity edema, atypical chest discomfort and poorly controlled blood pressure for which he increased Plaintiff's Losartan. (Tr. 623). He also noted that Plaintiff weighed 320 pounds, and he ordered a test for sleep apnea. Id. A February 3, 2012 echocardiogram revealed mild left ventricular systolic dysfunction, reflecting "probably mildly abnormal to mild cardiomyopathy." (Tr. 620). A February 16, 2012 sleep study revealed mild obstructive sleep apnea. (Tr. 630). Plaintiff was advised to lose weight, avoid activity that could put him in danger if he was sleepy and to attempt Continuous Positive Airway Pressure ("CPAP") titration. Id. A CPAP titration study produced increased sleep efficiency (Tr. 624-625), and on March 23, 2012, Plaintiff was ordered a CPAP machine. (Tr. 632).

On April 24, 2012, Plaintiff told Dr. Seballos that he had recently felt dizzy and fallen down the stairs. (Tr. 602). Dr. Seballos noted that his heart rate and rhythm were regular, stated that the etiology of the episode was unclear, and advised him to follow up with his cardiologist. Id. On October 18, 2012, Plaintiff saw Dr. Siddiq, reporting shortness of breath on exertion and dizziness

-14-

when stooping down.  (Tr. 646).  Dr. Siddiq stated that the shortness of breath was likely related to asthma, obesity and smoking (which Plaintiff had recently restarted), and that the dizziness could be due to low blood pressure.  (Tr. 646-647).  He decreased Plaintiff's Losartan dose and recommended further follow-ups for his cardiac condition.  Id.

On January 28, 2013, Plaintiff visited Dr. Seballos reporting a cough and shortness of breath. (Tr. 678).  Dr. Seballos prescribed Albuterol for his COPD.  Id.  On August 13, 2013, Plaintiff was diagnosed with diabetes and started taking Metformin. (Tr. 660-661). Respiratory and cardiovascular exams were negative. (Tr. 661).  On September 13, 2013, Dr. Seballos noted that Plaintiff had lost some weight since starting Metformin and was attempting to exercise more.  (Tr. 657-658).  In particular, Plaintiff stated that he had been walking more since moving to a high-rise building and needed to walk one-half mile to the smoking area.  (Tr. 657).  Dr. Seballos also noted that his blood pressure was "near goal."  (Tr. 658).  Physical examinations during the rest of 2013 and early 2014 were generally normal.  (Tr. 648-656, 663-677).

When Plaintiff saw Dr. Seballos on December 28, 2009, her diagnoses included depression not otherwise specified, which she characterized as "likely situational."  (Tr. 409).  Plaintiff did not have any mental-health complaints at that time id., or during subsequent visits to Thundermist or other providers over the next few months. (Tr. 411-433, 447). On September 13, 2010, Plaintiff told Dr. Seballos that he had been feeling depressed about his physical impairments and that friends and family had been commenting on his energy levels.  (Tr. 463).  A screening test indicated moderate depression and Dr. Seballos prescribed Prozac.  Id.

On October 20, 2010, Patricia Lizak, a social worker at Thundermist, conducted a diagnostic interview.  (Tr. 456).  Plaintiff reported that he was often angry and irritable, his mood was labile,

he experienced excessive worry and anxiety, he was easily distracted and unable to focus, he lacked energy, he had some memory loss and he had sleep difficulties.  (Tr. 457).  Ms. Lizak noted that he was cooperative and fully oriented, his mood was depressed, his affect was blunted, his speech was appropriate, his thought process was appropriate to content, he had no memory impairment, his perceptions were normal, his insight was fair to good, his judgment was good and he denied suicidal or homicidal ideation.  Id.  Ms. Lizak assessed depressive disorder and generalized anxiety disorder and recommended follow-up treatment and outdoor activity.  Id.  On December 1, 2010, Plaintiff told Ms. Lizak he was feeling "about the same," but had been going outside more and walking and remained close to family members.  (Tr. 452).  Ms. Lizak noted that Plaintiff had a depressed mood, blunted affect, and low self-esteem but her mental status examination was otherwise normal.  (Tr. 453).

On December 29, 2010, Plaintiff saw Susan Gagnon, a psychiatric clinical nurse specialist ("PCNS"), for an initial psychiatric medication evaluation.  (Tr. 481).  Ms. Gagnon noted that he was cooperative and fully oriented, had a depressed mood and blunted affect, had normal eye contact and unremarkable psychomotor activity, kept his attention focused, had appropriate thought content and had good judgment and insight.  (Tr. 482).  She diagnosed him with major depressive disorder (recurrent, moderate) and generalized anxiety disorder and assessed a Global Assessment of Functioning ("GAF") score of 50.  (Tr. 482-483).  Ms. Gagnon also refilled Plaintiff's Prozac and prescribed Wellbutrin.  (Tr. 483).  On January 17, 2011, Plaintiff told Dr. Seballos that his depression was better with Wellbutrin.  (Tr. 582).  On February 14, 2011, Ms. Lizak noted that Plaintiff was less depressed and less anxious, and that he was "relatively stable" and remained close

to family members.  (Tr. 580).  On February 16, 2011, Ms. Gagnon also noted that Plaintiff was less depressed and less anxious.  (Tr. 577).  She decreased his Wellbutrin and added Clonazepam.  Id.

In February 2011, consultative psychologist Dr. Wendy Schwartz examined Plaintiff at the Agency's request.  (Tr. 489-494).  Plaintiff reported an anxious mood, excessive worries, low energy and mild concentration problems.  (Tr. 491).  Dr. Schwartz observed that his attitude was cooperative, his affect was blunted, his mood was dysphoric, he displayed "grossly no sense of humor," his eye contact was good, an adequate rapport was established, he was easy to understand and his recall for specifics was good.  (Tr. 490).  She noted that he was able to maintain focus during the evaluation, perform a serial seven subtraction test, and spell "world" backwards correctly but also noted that he tired easily and had a low frustration tolerance.  (Tr. 492-493).  She further noted that he scored within normal limits on a Mini Mental Status Exam, his thought and association were logical, his judgment was good, his insight was fair to good, his mood was dysphoric, and his affect was blunted, but he had no delusions, hallucinations, obsessions, or compulsions and he did not present any significant memory issues or evidence of cognitive loss.  (Tr. 493).  Dr. Schwartz diagnosed Plaintiff with generalized anxiety disorder and major depressive disorder (recurrent, moderate) and assessed a GAF score of 54.  (Tr. 493-494).  She opined that his functional limitations appeared to be due primarily to physical issues, and that his ability to understand, remember and follow directions appeared to be mildly impaired due to concentration issues.  (Tr. 494).  She further opined that his ability to respond appropriately to customary work pressures, colleagues and supervisors appeared to be moderately to severely impaired, but that he had consistently maintained full-time employment, apparently without any significant history of difficulties dealing with people. Id.  She also noted that he demonstrated fair coping skills.  Id.

During appointments at Thundermist in March through July 2011, Plaintiff continued to report varying levels of depression and anxiety, and he was consistently fully oriented, cooperative, talkative, and focused, with appropriate thought process and content, no memory impairment, fair to good insight and judgment and improving self-esteem. (Tr. 554, 558, 570, 573). In July 2011, he began taking Cymbalta instead of Prozac and Wellbutrin. (Tr. 556).

In September 2011, Plaintiff began counseling sessions with Jessica Fidaglo, M.A. (Tr. 552-553, 549-550). He reported fighting with a friend and having nightmares, difficulty sleeping, low energy and motivation, difficulty remembering to take his medications without his mother reminding him and problems with anxiety and anger management. (Tr. 550, 553). Ms. Fidalgo noted that Plaintiff was cooperative but agitated, had remote memory loss but was attentive and had normal perceptions, had appropriate thought process, his thought content was hopeless and indecisive but help-seeking, his insight was fair to poor and his judgment was poor but his impulse and anger control were good. (Tr. 549).

On October 6, 2011, Plaintiff told Nancy Shea, PCNS, that he had been more irritable lately and was losing friends as a result. (Tr. 546). Ms. Shea noted that he was irritable but cooperative, his thought content was unremarkable and his thought process was appropriate, his speech was articulate, his psychomotor activity was unremarkable, his attention was focused and he had no memory impairment. (Tr. 545). Ms. Fidalgo made a similar assessment. (Tr. 543-544).

On December 8, 2011, Plaintiff told Ms. Fidalgo that he was anxious about meeting with Ms. Shea because she yelled at him if he was late. (Tr. 536). On January 6, 2012, Ms. Fidalgo alerted Ms. Shea. (Tr. 532). She noted that Plaintiff had poor judgment and was forgetful, but also that he was alert, oriented, cooperative, talkative and attentive. (Tr. 531). On February 10, 2012, Ms. Shea

-18-

"cleared up some misperceptions" with Plaintiff; she noted that his mood was depressed and anxious, but her mental status examination was otherwise normal. (Tr. 614-615). On February 24, 2012, she replaced Cymbalta with Venlafaxine. (Tr. 610). On April 9, 2012, Plaintiff told Ms. Fidalgo that he was experiencing increased stress at home with his mother, but that his depressive symptoms were decreasing. (Tr. 607). Ms. Fidalgo noted that his judgment and insight were improving. (Tr. 606).

On June 29, 2012, Plaintiff saw Elizabeth Bianchino, PCNS, for medication management. (Tr. 724). Ms. Bianchino noted that Plaintiff was cooperative and fully oriented, his mood was euthymic but anxious at times, his affect was normal and congruent with his mood, he was fidgety, his speech was normal, he had no memory impairment, his attention was focused, his thought process was intact and his insight and judgment were improving. Id. She continued his prescriptions for Cymbalta, Clonazepam, Prazosin and Trazadone and discontinued Venlafaxine. Id. Ms. Bianchino continued to manage Plaintiff's medications throughout 2012 and 2013 (through January 2014), and, despite noting anxiety over family and housing issues and variations in his mood and affect, she consistently described him as alert, cooperative, articulate, attentive, and focused, with normal perceptions, intact thought process, fair insight and judgment and no memory impairment. (Tr. 691-699, 702-722). Plaintiff also continued to see Ms. Fidalgo for individual therapy throughout this time. (Tr. 728-776).

A.   **The ALJ's Decision**

The ALJ decided this case adverse to Plaintiff at Step 5. At Step 2, the ALJ found that Plaintiff's cardiomyopathy, morbid obesity, major depressive disorder and generalized anxiety disorder, were "severe" impairments as defined in 20 C.F.R. §§ 404.1520(c) and 416.920(c). (Tr.

17).   However, at Step 3, the ALJ did not find that these impairments, either singly or in combination, met or medically equaled any of the Listings.  (Tr. 17-18).   As to RFC, the ALJ determined that Plaintiff was able to perform a limited range of light work subject to certain postural, environmental and nonexertional limitations.  (Tr.18-19).  Based on this RFC and testimony from the VE, the ALJ concluded at Step 5 that Plaintiff was able to make a successful adjustment to other light, unskilled positions available in the economy.  (Tr. 24-25).  Accordingly, the ALJ found that Plaintiff was not entitled to disability benefits.

### B.      The Late-tendered Evidence

Plaintiff submitted medical evidence on March 13, 2014 which the ALJ declined to accept at the March 17, 2014 hearing pursuant to the so-called "Five-day Rule" contained in 20 C.F.R. § 405.331(b).  Plaintiff contends that the ALJ abused her discretion in doing so.

The "Five-day Rule" requires that "[a]ny written evidence that you wish to be considered at the hearing must be submitted no later than five business days before the date of the scheduling hearing."  In the event of a late filing, the ALJ "may" decline to consider the evidence unless (1) the Commissioner's action misled the claimant; (2) the claimant had a physical, mental, educational or linguistic limitation that prevented earlier submission; or (3) some other unusual, unexpected or unavoidable circumstance beyond the claimant's control prevented him from submitting the evidence earlier.  20 C.F.R. § 405.331(b).  This Court has held that the Rule is not meant to be applied "rigorously or rigidly" and analogized the applicable standard to be one of "excusable neglect."  See Howe v. Colvin, 1:14-cv-00544-M, 2015 WL 7890085 (D.R.I. Dec. 4, 2015).

Here, Plaintiff contends that the late submission was unavoidable and due solely to a delay in response by Plaintiff's treating health clinic.  (Document No. 18 at p. 6).  Plaintiff's counsel

indicates that he made four requests for the records in the weeks leading up to the hearing and provided them to the Hearing Office on the date received which was only one day late.  Id.

Even assuming that the ALJ erred by not accepting the late-tendered records, a review of the records (Tr. 783-797) reveals that any such error is plainly harmless.  The first document is a conclusory opinion from Dr. Seballos dated March 11, 2014.  (Tr. 783).  Dr. Seballos opines that Plaintiff is unable to "participate in sustained full-time competitive employment."  Id.  The opinion contains no functional assessments and no reference to any supporting treatment records.  Further, although it was offered by a treating physician, the opinion is on an issue reserved to the Commissioner and thus not entitled to any special significance.  20 C.F.R. § 404.1527(d).  The second is a mental RFC assessment completed by Ms. Bianchino, a nurse specialist, on March 13, 2014.  (Tr. 784).  Since Ms. Bianchino is not an acceptable medical source, her opinions are not entitled to controlling weight.  See 20 C.F.R. §§ 404.1513(a) and 404.1527(a)(2).  In addition, the ALJ had already considered and discounted a similar, earlier opinion from Ms. Bianchino.  (Tr. 23).  Thus, the March 13, 2014 opinion (which was not accompanied by any new treatment notes and contained no narrative supporting explanation) was cumulative and not material to the record.  Accordingly, even if the ALJ violated the "Five-day Rule," a remand to consider these two excluded reports would be a meaningless exercise.

C.      **The ALJ Adequately Accounted for Plaintiff's Obesity**

Plaintiff argues that the ALJ failed to properly consider the "additional and cumulative effects" of his obesity.  Plaintiff's argument is unsupported.  The ALJ found Plaintiff's morbid obesity to be a severe impairment at Step 2 (Tr. 17) and repeatedly considered his physician's references to his obesity and related problems throughout her RFC evaluation. (Tr. 20-22).  Further,

-21-

the ALJ's RFC assessment limiting Plaintiff to a limited range of light work is supported in the record by the medical opinions of Dr. Tonelli and Dr. Georgy who imposed similar limitations related to Plaintiff's high BMI.  (Tr. 22, 440 and 472).

Plaintiff also faults the ALJ's evaluation of the opinion of Dr. Gaeta, the ME.  At the initial hearing, Dr. Gaeta testified that Plaintiff was capable of light exertion.  (Tr. 48).  However, upon further examination by Plaintiff's counsel, Dr. Gaeta conceded that Plaintiff's obesity would limit him to sedentary activity in terms of standing/walking.  (Tr. 49).  While the ALJ disagreed and assessed an RFC for a limited range of light work (Tr. 23 at n.5), the error, if any, is harmless since the VE testimony at both hearings would still support a no-disability finding with a sedentary RFC.  (Tr. 53, 70-71).  In other words, even with a sedentary work restriction, the VEs opined that Plaintiff was capable of performing unskilled jobs existing in significant numbers in the economy.  Id.

### D.   The ALJ Properly Considered Plaintiff's Mental Impairments

Plaintiff faults the ALJ for "downplaying" his psychiatric disorders.  The ALJ determined that Plaintiff had only a mild restriction in activities of daily living and moderate difficulties with social functioning and concentration, persistence or pace.  (Tr. 18).  The ALJ properly incorporated these assessments into his RFC finding.  Id.  The ALJ based his assessment on several factors.  First, she accurately found that Plaintiff's allegations as to his mental limitations were inconsistent with his recorded activities and thus were not totally credible.  (Tr. 19-20).  Plaintiff has not challenged this credibility finding.  The ALJ also properly discounted the weight to be given to Dr. Slavit's 2011 opinion that Plaintiff's psychiatric impairments were non-severe based on his review of subsequent treatment records.  (Tr. 22 at n.3, 496).

-22-

Further, Plaintiff has shown no error in the ALJ's evaluation of and partial reliance upon Dr. Schwartz's 2011 consultative report. (Tr. 22; Exh. 13F). The ALJ afforded great weight to Dr. Schwartz's opinion that Plaintiff's ability to follow directions was mildly impaired (Tr. 22; see Tr. 494), and, accordingly, limited Plaintiff to simple, one- to three-step tasks. (Tr. 18). The ALJ discounted Dr. Schwartz's opinion that Plaintiff's ability to respond appropriately to customary work pressures, colleagues and supervisors was "moderately severely" impaired, finding it inconsistent with her contemporaneous observation that Plaintiff had maintained consistent full-time employment until late 2009 without any apparent difficulties dealing with people in positions of authority and left due to his heart problems. (Tr. 22; see Tr. 494). Plaintiff denied any history of problems with authority figures to Dr. Schwartz, and he established an "easy rapport" with her. (Tr. 492). The ALJ also found Dr. Schwartz's assessment of "moderately severe" social impairments inconsistent with her own GAF score of 54 (Tr. 494), suggesting only moderate symptoms, as well as Plaintiff's treatment notes generally reflecting normal mental status examinations and describing Plaintiff as cooperative. (Tr. 22). The ALJ nevertheless included substantial social limitations in the RFC, including appropriate limitations on contact with colleagues and supervisors supported by the record. (Tr. 18). Finally, the ALJ gave good reasons for discounting the opinions of Plaintiff's treating sources including Dr. Seballos and the other non-physician providers. (Tr. 23).

While reasonable minds may differ as to the interpretation of this medical evidence, the issue presented in this administrative appeal is not whether this Court would have reached the same conclusion as did the ALJ. The ALJ's resolution of evidentiary conflicts must be upheld if supported by substantial evidence, even if contrary results might have been tenable also." Benetti v. Barnhart, 193 Fed. Appx. 6, 2006 WL 2555972 (1st Cir. Sept. 6, 2006) (per curiam) (citing Rodriguez-Pagan

v. Sec'y of HHS, 819 F.2d 1 (1ˢᵗ Cir. 1987)).  Rather, the narrow issue presented is whether the ALJ's findings have adequate support on the record.  Since they do in this case, Plaintiff has provided no basis upon which this Court could reject and reverse them.

## VI.    CONCLUSION

For the reasons discussed herein, I recommend that Plaintiff's Motion to Reverse (Document No. 14) be DENIED and that Defendant's Motion to Affirm (Document No. 17) be GRANTED. Further, I recommend that Final Judgment enter in favor of Defendant.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen days of its receipt.  See Fed. R. Civ. P. 72(b); LR Cv 72. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision.  See United States v. Valencia-Copete, 792 F.2d 4, 6 (1ˢᵗ Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1ˢᵗ Cir. 1980).

  /s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
May 4, 2016